Brian L. Grossman
Justin M. Loveland
Stefan Savic
**Reinhardt Savic Foley LLP**
200 Liberty Street, 27th Floor
New York, New York 10281
Telephone: (646) 357-3238
Facsimile: (212) 710-0971
bgrossman@rsf-llp.com
jloveland@rsf-llp.com
ssavic@rsf-llp.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT NEW YORK**

| | |
|---|---|
| **SURFSIDE SOLUTIONS INC.**,<br><br>Plaintiff,<br><br>v.<br><br>**MNG 2005 INC. d/b/a CBD KRATOM**,<br><br>Defendants. | Civil Case No.: 1:25-cv-2579<br><br>**COMPLAINT** |

Plaintiff Surfside Solutions Inc. ("Surfside," or "Plaintiff"), by its attorneys Reinhardt Savic Foley LLP, hereby alleges against Defendant MNG 2005 Inc. d/b/a CBD Kratom ("CBDK" or "Defendant") as follows:

## NATURE OF THE ACTION

1. This is a straight-forward case that Plaintiff was forced to bring as a result of Defendant's failure to pay months' worth of invoices for the advertising services that Plaintiff provided to Defendant.

2. Plaintiff was contracted by Defendant to run an advertising campaign to generate over 130 million ad impressions targeting major markets in New York, Chicago, Philadelphia, St. Louis, Dallas, and Houston.

3. Instead of paying for Plaintiff's services, all of which were provided and duly invoiced for, Defendant has attempted to condition payment on performance of non-contracted-for services, as opposed to impressions and clicks: Defendant raised issues with foot-traffic metrics, which Plaintiff only provided to Defendant to help Defendant determine performance, not as a contracted-for deliverable; Defendant had the ability to exercise a 72-hour notice cancellation of the campaign to Plaintiff, and only used it in October of 2023, after Plaintiff sent all of the unpaid invoices subject to the first contract; Defendant asked for a three-month trial period for Plaintiff to seek to win back Defendant's business, which was completely independent of prior outstanding invoices, but after Plaintiff hit the targets during that period, Defendant denied the same based on undisclosed metrics and then used the same as a basis to stiff Plaintiff on the prior, unrelated invoices as well; Defendant had another opportunity to exercise a 72-hour notice cancellation of the trial campaign, but never cancelled it while reaping its benefits.

4. When Plaintiff hit the agreed-upon benchmarks in the trial period, reflected on point-of-sale data, and even demonstrated that the previous campaign was still performant, Defendant claimed that Plaintiff misrepresented foot-traffic metrics, and again used the point-of-sale data to try to avoid paying the invoices Plaintiff sent.

5. Defendant has unequivocally received the services with no intent to pay, forcing Plaintiff to institute the present action.

## PARTIES

6.  Plaintiff Surfside Solutions Inc. is a Delaware corporation with a principal place of business at 64 Wooster St., Floor 2, New York, NY 10012.

7.  Defendant MNG 2005 Inc. d/b/a CBD Kratom is a Missouri corporation with a principal place of business of 12400 Olive Blvd., Ste. 100, Saint Louis, MO 63141-5435.

## JURISDICTION AND VENUE

8.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(l). There is complete diversity among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.  Plaintiff is a citizen of Delaware and New York.

10. Defendant is a citizen of Missouri.

11. The Court has personal jurisdiction over Defendant as Defendant agreed in the Terms and Conditions that "[a]ny litigation arising out of this Agreement shall be litigated exclusively in the state or federal courts located in the State of New York."

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Defendant has consented to this Court's jurisdiction by virtue of the foregoing forum selection clause of the contract between the parties.

## STATEMENT OF FACTS

13. Plaintiff has supplied marketing and advertising services to Defendant in the ordinary course of business.

14. On or about March 31, 2023, Plaintiff and Defendant entered into a written contract identified as order Q-00588 (hereinafter the "First Contract"), signed by a duly authorized representative of Defendant, namely its Chief Operating Officer Jason Brandl.

15. Per the First Contract, Plaintiff was to provide advertising services, recorded as ad impressions, for Defendant, utilizing Plaintiff's ad server to track performance of the campaign.

16. Specifically, Plaintiff's services included using the ad server to determine fulfillment of impressions and click guarantees, and the campaign was to run until the specified impression and click guarantees were satisfied to ensure the deliverables were met.

17. There was no provision or requirement in the First Contract that Plaintiff was to suppress existing customer data or net new customers in calculating ad impressions or otherwise in providing advertising services.

18. The First Contract contained no provision that required Plaintiff to secure new customers for Defendant, nor did it obligate Plaintiff to perform any services beyond running the ad impressions.

19. Payment under the First Contract was not contingent upon performance, only ad impressions.

20. Plaintiff disclosed the price of its marketing and advertising services prior to providing them to Defendant and Defendant accepted the price without objection.

21. Specifically, the billing schedule in the First Contract provided for a budget of up to $933,208.00, reflective of 147,862,778 impressions.

22. Plaintiff provided the agreed-upon services to Defendant and Defendant accepted the services without objection for months.

23. Defendant made certain payments for invoices for services provided by the Plaintiff.

24. However, Defendant has failed to pay certain services and invoices associated with the First Contract in the total outstanding amount of $382,074.72.

25. Specifically, Plaintiff provided to Defendant the following invoices associated with the First Contract:

a. Invoice No. 6756, on June 15, 2023, in the amount of $95,518.62;

b. Invoice No. 7004, on July 18, 2023, in the amount of $95,518.70;

c. Invoice No. 7226, on August 16, 2023, in the amount of $95,518.70; and

d. Invoice No. 7455, on September 19, 2023, in the amount of $95,518.70.

(hereinafter "Outstanding First Contract Invoices")

26. Defendant paid none of the Outstanding First Contract Invoices.

27. Defendant's claim for non-payment was that there was over-reporting of foot traffic data by Plaintiff.

28. Defendant continued to run and pay Plaintiff for the services after Defendant initially raised issues with the foot traffic metrics provided by Plaintiff. Foot traffic campaigns have inherent flaws, which was stated to Defendant.

29. Per Defendant's request, and prior to Defendant ceasing to pay Plaintiff, Plaintiff worked with Defendant to actively audit and revise the foot traffic reporting until it aligned with Defendant's point-of-sale system data. The audit and revision were based on Defendant's estimated conversion rates of customers entering the store to customers making purchases.

30. Defendant's concerns over foot-traffic metrics are thus not a valid basis for non-payment, as the services—ad impressions—were still provided, irrespective of whether the foot-traffic monitoring needed to be adjusted to come in to line with Defendant's own understanding of its own conversion rates outside of this data from Plaintiff.

31. The First Contract expressly provided that Plaintiff would not be responsible for any discrepancies between Plaintiff's ad server and Defendant's ad server.

32. Such discrepancies fall outside Plaintiff's obligations as defined by the First Contract.

33. Approximately three months into the first ad campaign, Defendant stopped making payments on Plaintiff's invoices.

34. Defendants cited concerns about the accuracy of foot traffic data and claimed that purported over-reporting resulted in increased ad impression budgets. However, Defendants only raised these concerns after Plaintiff delivered the services and after Plaintiff audited the foot traffic data, which aligned with Defendant's point-of-sale data.

35. Importantly, Defendant continued to receive the benefit of the ad campaign and did not cancel the ad campaign until at least approximately October of 2023.

36. In good faith, Plaintiff offered a three-month trial period to mitigate the perceived concerns. This was despite Defendant continuing to withhold payment for services already provided, while also stating that Defendant wanted to continue to work with Plaintiff.

37. Defendant attempted to require Plaintiff to agree that Defendant would not have to pay for the Outstanding First Contract Invoices if the trial period failed to meet the agreed-upon metrics but Plaintiff refused this requirement.

38. Plaintiff offered this trial period to demonstrate the possibility of a successful campaign, with the Outstanding First Contract Invoices due irrespective of the results.

39. The supplemental trial period was aimed solely at preserving the business relationship and Plaintiff's ability to demonstrate to Defendant that Plaintiff's campaigns worked. Plaintiff hoped that after it demonstrated the same to Defendant, Defendant would want to continue to work with Plaintiff thereafter.

40. On or about June 12, 2024, Plaintiff and Defendant entered into a second written contract identified as order Q-02073 (hereinafter the "Second Contract"), again signed by a duly authorized representative of Defendant, Chief Operating Officer Jason Brandl.

41. Plaintiff disclosed the total contract amount of the Second Contract prior to providing services under the Second Contract to Defendant. Specifically, the Second Contract was for a total amount of $60,000.00.

42. Defendant accepted the price and total contract amount without objection.

43. Plaintiff then provided the agreed-upon services to Defendant.

44. Defendant again made selected payments for invoices for services provided by Plaintiff.

45. However, Defendant failed to pay for certain services and invoices associated with the Second Contract in the total outstanding amount of $36,000.00, including as follows:

   a. Invoice No. 11000, on September 25, 2024, in the amount of $16,000.00;

   b. Invoice No. 11212, on October 18, 2024, in the amount of $16,000.00; and

   c. Invoice No. 11467, on October 31, 2024, in the amount of $4,000.00.

   (hereinafter "Outstanding Second Contract Invoices")

46. Under the Second Contract, Plaintiff provided several additional measurements and revisions to the campaign to address Defendant's concerns, constantly narrowing down and eliminating outlier data.

47. Specifically, Plaintiff implemented strategies to retarget only lapsed customers who had not purchased from Defendants in one year, with the understanding that Defendant would provide Plaintiff with an updated CRM suppression list on a monthly basis.

48. Plaintiff also agreed to achieve a 3.47 ROAS goal, which was successfully met during the life of the campaign, and in particular demonstrated each day during the final two weeks of the campaign as required by the Second Contract.

49. After the three-month trial period, however, Defendant continued to refuse to pay for the services Plaintiff rendered, which was based entirely on point-of-sale data, despite analytic data Plaintiff has provided that supports a positive outcome of the campaign.

50. Plaintiff delivered all agreed-upon services in full compliance with the terms of the First and Second Contracts and has successfully met all the outlined, agreed upon benchmarks.

51. Defendant had the opportunity to cancel services by providing a 72-hour notice, as outlined in the terms and conditions of both the First and Second Contracts.

52. Defendant only invoked the 72-hour clause in or around October 2023 with respect to the First Contract, after the invoices at issue in this lawsuit were already provided to Defendant and due and owing for services that had already been performed.

53. Instead, Defendant saw both campaigns through and raised issues only when it was Defendant's turn to perform under the agreement by paying for the services.

54. Notwithstanding their claims of dissatisfaction with the services and the opportunity to cancel, Defendant continued to accept and receive free and/or discounted services, retaining the benefit of these services although Defendant could have cut them off at any point.

55. Defendant claimed on multiple occasions that its own purported metrics demonstrated that Plaintiff had not complied with the terms in the Second Contract—in direct contradiction to Plaintiff's metrics—but Defendant has refused to share these purported metrics despite promising to do so on multiple occasions.

56. The total outstanding amount owed to Plaintiff by Defendant from the First and Second Contracts is $418,574.72.

57. Pursuant to the terms and conditions incorporated by reference in both the First and Second Contracts, and available on Plaintiff's website,[1] Defendant agreed that interest on late payments of Plaintiff's invoices would accrue at the lower of 12% interest per year or the highest amount interest permitted by law. The terms and conditions also provided for the payment of attorneys' fees.

## AS AND FOR A FIRST CAUSE OF ACTION

### (Account Stated)

58. Plaintiff re-alleges and incorporates by reference all allegations contained in the preceding paragraphs of the Complaint as if they were fully set forth herein.

59. Plaintiff submitted the Outstanding First Contract Invoices and Outstanding Second Contract Invoices (together, the "Invoices") for the services it provided to Defendant.

60. Defendant accepted the Invoices as correct and without objection for a sufficient period of time to deem them accepted.

61. Specifically, on or about October 16, 2023, Defendant exercised the 72-hour cancellation notice provision in the First Contract and also stated, "please send over a statement of our account and all outstanding invoices. We will review and process accordingly," with a list of what Defendant believed to be outstanding.

62. Plaintiff suffered and continues to suffer damages as a result of Defendant's failure to pay the Invoices.

---

[1] *See* Common Section 3, Terms and Conditions (citing to https://surfside.io/ad-terms and https://surfside.io/data-terms).

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Contract)

63. Plaintiff re-alleges and incorporates by reference all allegations contained in the preceding paragraphs of the Complaint as if they were fully set forth herein.

64. Plaintiff and Defendant entered into an agreement for Plaintiff to provide to Defendant marketing and advertising services.

65. Defendant agreed to the price of the services and accepted the services without objection.

66. Defendant's claimed issues with the services provided were not breaches by Plaintiff, as the terms of neither the First Contract nor the Second Contract guaranteed specific results—such as netting new clients—but rather outlined only agreed-upon services—ad impressions and, in the case of the Second Contract, certain specific "goals" including a 3.47 or higher ROAS at least in the last fourteen days of the contract, which Plaintiff met.

67. The goals outlined in the Second Contract were to determine whether Plaintiff and Defendant would continue to work with another on future business.

68. Plaintiff fully performed under the agreements, providing Defendant with the agreed-upon services.

69. The Defendant's claim is not a valid contractual basis for non-payment.

70. Defendant breached the agreement by failing to pay for the services.

71. As a result of Defendant's breach, Plaintiff suffered damages in the amount of $418,574.72, plus 12% interest, plus attorneys' fees and costs in collecting the payments.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiff respectfully requests the Court to:

    a.   Award actual damages to be established at trial, but not less than $418,574.72, plus 12% interest;

    b.   Award Plaintiff the costs of this action together with reasonable attorneys' fees;

    c.   Award Plaintiff punitive damages in an amount to be determined at trial;

    d.   Award Plaintiff pre- and post-judgment interest in the statutory amount; and

    e.   Grant such other and further relief as this Court deems just and proper.

Dated: New York, New York
       March 28, 2025

By: _____
Justin M. Loveland
Brian L. Grossman
Stefan Savic
**Reinhardt Savic Foley LLP**
200 Liberty Street, 27th Floor
New York, New York 10281
Telephone:   (646) 357-3238
Facsimile:   (212) 710-0971
jloveland@rsf-llp.com
bgrossman@rsf-llp.com
ssavic@rsf-llp.com
*Attorneys for Plaintiff*